**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

MICHAEL J. MACK,

                                        Plaintiff,

         - v -                                             Civ. No. 6:02-CV-1283
                                                                    (DNH/RFT)

JO ANNE B. BARNHART, Commissioner of
Social Security,

                                        Defendant,

**APPEARANCES:**                             **OF COUNSEL:**

HINMAN, HOWARD LAW FIRM                  EUGENE D. FAUGHNAN, ESQ.
Attorney for Plaintiff
P.O. Box 5250
80 Exchange Street
700 Security Mutual Building
Binghamton, New York 13902

HON. GLENN T. SUDDABY                    WILLIAM H. PEASE, ESQ.
United States Attorney for the           Assistant United States Attorney
Northern District of New York
Attorney for the Defendant
P.O. Box 7198
100 S. Clinton Street
Syracuse, New York 13261

**RANDOLPH F. TREECE**
**UNITED STATES MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**

         In this action, Plaintiff Michael Mack moves, pursuant to 42 U.S.C. § 405(g), for review of a

decision by the Commissioner of Social Security denying his application for disability insurance

benefits.[1]  Based upon the following discussion, this Court recommends that the Commissioner's

---

[1] This case has proceeded in accordance with General Order 18 which sets forth the procedures to be followed
when appealing a denial of Social Security benefits.  Both parties have filed briefs, though oral argument was not heard.
Dkt. Nos. 7 & 9.  The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. §
636(b) and N.D.N.Y.L.R. 72.3(d).

decision denying Social Security benefits be **affirmed**.

## I. BACKGROUND

### A. Facts

Generally, Mack alleges a disability due to coronary artery disease with prior myocardial infarction and angioplasties and generalized tonic-clonic seizures. Dkt. No. 6, Admin. Transcript [hereinafter "Tr."] at 144 & 238. The administrative record contains the following medical history.

Plaintiff has a history of coronary artery disease dating back to at least 1993 when he suffered a myocardial infarction.[2] *Id*. at 238. Since then, Mack has undergone angioplasties, first in 1993 and then in 1994. *Id*. at 301.

On May 20, 2000, Mack was admitted to the emergency room of United Health Services Hospitals (UHSH), after having a grand mal seizure. *Id*. at 208-18. Sae-Joun Park, M.D., Mack's treating physician, reported normal examination reports. *Id*. at 211. An electroencephalogram (EEG) was normal and magnetic resonance imaging (MRI) and computerized tomography (CT) scans of Mack's head and brain were also normal. *Id*. at 216-17 & 219-20. Dr. Park diagnosed Mack with new onset grand mal seizure, coronary artery disease status post angioplasty times two, and hypertension. *Id*. at 212. Mack was discharged the following day and was directed by Dr. Park and Taseer Minhas, M.D., a neurologist with UHSH, to refrain from driving for six months, per New York State Law, and to take medications, specifically Dilantin, as prescribed. *Id*. at 208.

On May 24, 2000, Plaintiff underwent a cardiac evaluation by Chitta R. Mohapatra, M.D., Mack's treating cardiologist. *Id*. at 221-23. Dr. Mohapatra reported normal examination results,

---

[2] Myocardial infarction is defined as "gross necrosis of the myocardium as a result of interruption of the blood supply to the area; it is almost always caused by atherosclerosis of the coronary arteries, upon which coronary thrombosis is usually superimposed." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 837 (28th ed. 1994).

with the exception of hemorrhage in Plaintiff's right eye.  *Id*. at 221.  An electrocardiogram (EKG) showed "tiny Q-waves in 2, 2, AVF," but otherwise no abnormality appeared.  *Id*. at 221 & 223. Dr. Mohapatra opined that Plaintiff's coronary artery disease appeared to be stable and recommended Plaintiff maintain his current medication levels and have a stress test for evaluation of coronary atherosclerosis.  *Id*. at 221.

On June 5, 2000, Dr. Minhas performed a follow-up examination.  *Id*. at 277-78.  It was noted that Mack had ceased taking his Dilantin medication four days after his seizure on May 20th. *Id*. at 277.  Plaintiff's neurological examination remained "nonfocal" and Dr. Minhas recommended continued use of Dilantin and follow-up in three months.  *Id*.

The record contains a copy of a handwritten note, dated July 19, 2000, on the stationary of Jeffrey C. Stillman, M.D., a physician of occupational medicine at UHSH.  *Id*. at 284.  Dr. Stillman restricted Plaintiff's use of a respirator, heavy machinery, and ladders.  *Id*.  He also directed Plaintiff to avoid "strenuous exertional activity" and "confined spaces."  *Id*.

On August 24, 2000, Dr. Minhas summarized his treatment and assessed Mack's functional abilities.  *Id*. at 224-30.  Dr. Minhas noted normal examination testing results and normal CT scan. *Id*. at 224-27 & 229.  He also noted that Plaintiff had not been following the treatment prescribed. *Id*. at 228.  Dr. Minhas opined that Mack had no physical limitations whatsoever, except that in accordance with New York State Law, Plaintiff could not drive a car until he is seizure free for 6-12 months on medication.  *Id*. at 228-30.

On September 12, 2000, Dr. Park provided a summary of his treatment and assessed Plaintiff's functional abilities.  *Id*. at 231-37.  Dr. Park noted normal brain EEG and MRI and also opined that Plaintiff, with the exception of unspecified limitations in lifting, carrying, pushing, and

pulling, had no physical limitations.  *Id*. at 236-37.

On September 18, 2000, Plaintiff was consultively examined by Kavasseri Agneshwar, M.D., an internist.  *Id*. at 238-45.  Examination results and fine motor activity were normal.  *Id*. at 238-40.  Chest x-ray and EKG testing were normal; Dilantin levels, however, were sub-therapeutic.  *Id*. at 240-41.  Dr. Agneshwar diagnosed new onset seizure disorder with resulting memory loss, coronary artery disease, hypertension, and hyperlipidemia.  *Id*. at 241.  Dr. Agneshwar opined that Mack should not be involved with any hazardous environment and should not drive until he is seizure-free for one year.  *Id*. at 242.  He further opined that Mack has good motor function of both upper and lower extremities, "but endurance is limited because of his cardiac problem."  *Id*.

On October 9, 2000, Plaintiff underwent a consultive organicity evaluation by Maria C. Morog, Ph.D.  *Id*. at 246-50.  Mack exhibited low average intellectual functioning.  *Id*. at 248.  His memory was adequate on formal testing.  Mack's posture and motor behavior was normal, his eye contact was appropriately focused, he recalled and understood instructions, his attention and concentration were good, he worked with reflection and deliberation, and was found to be deliberate, orderly, and self-correcting in responding to test tasks.  *Id*.  The psychologist diagnosed rule out cognitive or learning disability, but no other mental impairment, and opined that Mack could perform all mental work-related activities.  *Id*. at 249.

On October 20, 2000, In Seok, M.D., a consultive physician, reviewed the record and assessed Plaintiff's physical RFC.  *Id*. at 251-57.  Dr. Seok opined that Plaintiff could lift and/or carry fifty pounds occasionally, twenty-five pounds frequently, and could stand and/or walk and sit for about six hours in and eight-hour day.  *Id*. at 252.  Further, Mack could frequently balance, stoop, kneel, crouch, and crawl, but never climb, and should avoid all exposure to hazards such as

machinery or heights. *Id*. at 253 & 255. A second consultive physician reviewed the record on December 19, 2000, and opined that Mack had no physical limitations, but should avoid concentrated exposure to hazards. *Id*. at 259-63.

On February 23, 2001, Plaintiff was admitted to the UHSH emergency room after another seizure. *Id*. at 285-86. He was discharged a few hours later with instructions to have his Dilantin checked in one week, increase dosage, and return to Drs. Park and Minhas for follow-up. *Id*. at 286. Five days after this second seizure, Dr. Park treated Plaintiff and increased his Dilantin prescription. *Id*. at 270.

On March 9, 2001, Dr. Mohapatra returned a blank medical assessment form to the Social Security Administration with a hand-written notation stating that Mack "is not disabled from cardiac standpoint. He is disabled from seizure disorder. The forms need to be filled out by his primary doctor or a neurologist." *Id*. at 279. Thereafter, on March 15, 2001, Dr. Park again assessed Plaintiff's functional abilities. *Id*. at 272-75. This time, Dr. Park opined that Mack can never lift or carry any weight whatsoever, and cannot sit, stand, or walk for any time at all in an eight-hour day. *Id*. at 272-73. He further opined that Mack can never perform any postural activities and is restricted from exposure to all environmental factors. *Id*. at 274-75. Dr. Park noted that the medical findings which support his assessment was a diagnosis for uncontrolled seizures. *Id*. at 275.

On April 18 and May 16, 2001, Plaintiff was examined by Jeffrey Ribner, M.D., a neurologist. *Id*. at 287-92. Examination results were normal. *Id*. at 289, 290-91, & 292. Dr. Ribner also reported normal laboratory test results, including EEG and MRI. *Id*. at 289. It was further noted that Plaintiff had not increased his Dilantin dosage as was recommended; Dr. Ribner

again recommended increasing Dilantin to therapeutic levels.  *Id*. at 292.

Dr. Mohapatra performed another cardiac evaluation on July 9, 2001.  *Id*. at 293-97.
Plaintiff complained of chest pain while at rest.  Examination results were normal and EKG showed
sinus rhythm and "nonspecific ST-T changes."  *Id*. at 293.  Dr. Mohapatra diagnosed chest pain,
"somewhat atypical rule out restenosis,"[3] prescribed medication, and recommended a stress test.  *Id*.
Then, on August 29, 2001, Plaintiff was again admitted to UHSH.  *Id*. at 298-371.  Mack reported
chest pain with fatigue and dyspnea, which occurred at rest with mild nausea, but was relieved by
Nitroglycerin at home.  *Id*. at 298.  He underwent a stress test that was negative for ischemia, but
his target heart rate was not achieved.  *Id*.  Catheterization revealed his right coronary artery was
patent within the stent and had some sub-critical narrowing, which was not felt to warrant
angioplasty; the left coronary artery system was unremarkable.  *Id*.  He was diagnosed with chest
pain, resolved, coronary artery disease that did not warrant angioplasty, hypertension,
hyperlipidemia, current cigarette smoking, and recent seizure disorder, controlled with Dilantin.  *Id*.
at 298-99.

Finally, the record contains yet another assessment from Dr. Park, dated February 26, 2002.
*Id*. at 372-73.  Dr. Park stated the current diagnosis was chest pain and was treated with
medications.  *Id*. at 372.  Dr. Park opined that Plaintiff can lift and/or carry five pounds and
occasionally lift and/or carry ten pounds.  *Id*. at 373.  He stated that Plaintiff's impairments prevent
him from performing work-related activities eight hours a day, five days a week.  *Id*.

## B.  Procedural History

---

[3] Restenosis is a recurrent narrowing or stricture of a duct or canal, "especially of a valve of the heart, after surgical correction of the primary condition."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1450 & 1576 (28th ed. 1994).

On August 4, 2000, Mack filed for disability insurance benefits alleging a disability onset date of May 19, 2000.  Tr. at 134-36.  That application was denied initially and on reconsideration. *Id*. at 94-98 & 101-03.  A Hearing was held before Administrative Law Judge (ALJ) John R. Tarrant on September 6, 2001, and was continued on March 7, 2002.  *Id*. at 28-91.  On April 15, 2002, ALJ Tarrant issued an unfavorable decision against Mack.  *Id*. at 14-24.  On August 30, 2002, the Appeals Council concluded there was no basis under the Regulations to grant Plaintiff's request for review, thus rendering the ALJ's decision the final determination of the Commissioner.  *Id*. at 6-7.  Exhausting all his options for review through the Social Security Administration's tribunals, Plaintiff now brings this appeal.

## II.  DISCUSSION

### A.  Standard of Review

Under 42 U.S.C. § 405(g), the proper standard of review for this Court is not to employ a *de novo* review, but rather to discern whether substantial evidence supports the Commissioner's findings and that the correct legal standards have been applied.  *See Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *Urtz v. Callahan*, 965 F. Supp. 324, 325-26 (N.D.N.Y. 1997) (citing, *inter alia*, *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  Succinctly defined, substantial evidence is "more than a mere scintilla," it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938).

The ALJ must set forth the crucial factors supporting the decision with sufficient specificity. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).  Where the ALJ's findings are supported by substantial evidence, the court may not interject its interpretation of the administrative record.

*Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); 42 U.S.C. § 405(g). Where the weight of the evidence, however, does not meet the requirement for substantial evidence or a reasonable basis for doubt exists as to whether correct legal principles were applied, the ALJ's decision may not be affirmed. *Johnson v. Bowen*, 817 F.2d at 986.

### B.  Determination of Disability

To be considered disabled within the meaning of the Social Security Act, a plaintiff must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore, the claimant's physical or mental impairments must be of such severity as to prevent engagement in any kind of substantial gainful work which exists in the national economy. *Id*. at § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner follows a five-step analysis, referred to as the sequential evaluation process, set forth in the Social Security Administration Regulations. 20 C.F.R. § 404.1520. At Step One, the Commissioner "considers whether the claimant is currently engaged in gainful activity." *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). If the claimant is engaged in substantial gainful activity, he or she is not disabled and the inquiry ends. If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to Step Two and assesses whether the claimant suffers from a severe impairment that significantly limits his or her physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If the claimant suffers from a severe impairment, the Commissioner considers at Step Three whether such impairment(s) meets or equals an impairment listed in

Appendix 1, in Part 404, Subpart P of the Regulations.  *Id*. at § 404.1520(d).  The Commissioner makes this assessment without considering vocational factors such as age, education, and work experience.  *Berry v. Schweiker*, 675 F.2d at 467.  Where the claimant has such an impairment, the inquiry ceases as he or she is presumed to be disabled and unable to perform substantial gainful activity.  *Id*.  If the claimant's impairment(s) does not meet or equal the listed impairments, the Commissioner proceeds to Step Four and considers whether the claimant has the residual functional capacity (RFC)[4] to perform his or her past relevant work despite the existence of severe impairments.  20 C.F.R. § 404.1520(e).  If the claimant cannot perform his or her past work, then at Step Five, the Commissioner considers whether the claimant can perform any other work available in the national economy.  *Berry v. Schweiker*, 675 F.2d at 467; 20 C.F.R. § 404.1520(f).

Initially, the burden of proof lies with the claimant to show that his or her impairment(s) prevents a return to previous employment (Steps One through Four).  *Berry v. Schweiker*, 675 F.2d at 467.  If the claimant meets that burden, the burden then shifts to the Commissioner at Step Five to establish, with specific reference to medical evidence, that the claimant's physical and/or mental impairment(s) are not of such severity as to prevent him or her from performing work that is available within the national economy.  *Id*.; 42 U.S.C. § 423(d)(2)(A); *see also White v. Sec'y of Health and Human Servs.*, 910 F.2d 64, 65 (2d Cir. 1990).  In making this showing at Step Five, the claimant's RFC must be considered along with other vocational factors such as age, education, past work experience, and transferability of skills.  20 C.F.R. § 404.1520(f); *see also New York v. Sullivan*, 906 F.2d 910, 913 (2d Cir. 1990).

---

[4] "Residual functional capacity" is defined by the Regulations as follows: "Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting.  Your residual functional capacity is what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).

**C.  ALJ Tarrant's Findings**

In addition to Mack's testimony at the Hearing, the ALJ secured the testimony of Esperanza DiStefana, a vocational expert (VE).  Tr. at 28-91.  The ALJ also had Mack's medical records consisting of treatment reports and opinions from various treating and/or examining physicians, including, 1) Chitta R. Mohapatra, M.D., Cardiologist Treating Physician; 2) Taseer A. Minhas, M.D., Neurologist Treating Physician; 3) Sae-Joun Park, M.D., Treating Physician; 4) Kavasseri Agneshwar, M.D., Internist Consultive Examiner; 5) Maria C. Morog, Ph.D, Organicity Consultive Examiner; 6) In Seok, M.D., Non-Examining Agency Residual Functional Capacity Assessment; 7) Jeffrey C. Stillman, M.D., Occupational Medicine; 8) Jeffrey A. Ribner, M.D., Neurologist; 9) United Health Services Hospitals, Wilson Memorial Regional Medical Center; and 10) Southern Tier Imaging.  *Id*. at 200-373.

Using the five-step disability evaluation, ALJ Tarrant found that 1) Mack had not engaged in any substantial work activity since the onset disability date; 2) his coronary artery disease with prior myocardial infarction and angioplasties and generalized tonic-clonic seizures constitute severe impairments; 3) these medically determinable impairments did not meet or medically equal any of the impairments listed in Appendix 1, Subpart P of Social Security Regulation No. 4, specifically Listings 4.04 and 11.02; 4) Mack has a residual functional capacity to perform a significant range of light work, and given such capacity, Mack is unable to perform any of his past relevant work as a heating and air conditioning mechanic; and 5) using the Medical-Vocational Rules as a framework, and in light of the VE's testimony, Mack's RFC, age, educational background, and work experience, there are a significant number of jobs in the national economy that Mack can perform. Tr. at 14-24.  After reviewing the administrative transcript, the Court finds that the ALJ applied the

correct legal standards and his findings are supported by substantial evidence of record.

### D.  Mack's Contentions

In general, Mack does not challenge the ALJ's findings in Steps One through Four.  Instead, Plaintiff asserts that the ALJ incorrectly assessed his RFC and in doing so, incorrectly failed to defer to the opinion of his treating physician, Dr. Park, in accordance with the Treating Physician Rule and failed to properly credit Mack's allegations of pain.  Mack also contends that the Commissioner failed to meet her burden at Step Five since the VE failed to identify a significant number of available jobs.

### 1.  Residual Functional Capacity

Mack contends that the ALJ erred in assessing his RFC, and further, the ALJ erred in failing to give full deference to Dr. Park's opinions and full credibility to Mack's allegations regarding pain.

The Commissioner assesses a claimant's RFC as a basis for determining the particular types of work the claimant may be able to perform despite the existence of physical and/or mental impairments.  *See* 20 C.F.R. § 404.1545(a); 20 C.F.R. Part 404, Subpart P, App. 2, § 200.00(c).  In qualifying work in the national economy, the Regulations classify and define jobs as sedentary, light, medium, heavy, and very heavy.[5]  20 C.F.R. § 404.1567.  In determining RFC, the ALJ can consider a variety of factors including a treating or examining physician's observations of limitations, the claimant's subjective allegations of pain, physical and mental abilities, as well as the

---

[5] These classifications are based according to the "degree of primary strength requirements of the occupations[,]" which consist of "three work positions (standing, walking, and sitting) and four worker movements of objects (lifting, carrying, pushing, and pulling)."  S.S.R. 83-14, 1983 WL 31254, at *1, *Program Policy Statement Titles II and XVI: Capability to do Other Work–The Medical-Vocational Rules as a Framework for Evaluating a Combination of Exertional and Nonexertional Impairments* (S.S.A. 1983).

limiting effects of all impairments even those not deemed severe.  *Id*. at § 404.1545(a).

In assessing Mack's RFC, the ALJ concluded that Mack could perform a significant range of light work.[6]  Specifically, the ALJ stated that Mack retains the residual functional capacity to sit, stand, and walk six hours in an eight-hour day, lift, carry, push, and pull up to twenty pounds occasionally.  Tr. at 19.  Furthermore, the ALJ stated that Mack "should avoid situations with exposure to the definite risk of bodily injury, temperature extremes, driving and confined spaces." *Id*.

In challenging the ALJ's RFC assessment, we note the Plaintiff merely states, without specific reference to the medical record, that the ALJ decided the case incorrectly.  For example, Plaintiff states that, "a close examination of the residual functional capacity as set forth by the treating physicians" directs a conclusion contrary to the ALJ's finding (Dkt. No. 7 at p. 8); however, there is absolutely no mention of what specific record(s) and which treating physician(s)' opinion(s) support this statement.  Later in his Brief, Plaintiff does make general reference to Dr. Park's opinions in criticizing the ALJ for discounting such opinions, yet, once again, there is no specific reference made to the medical record.  In accordance with General Order 18, which governs appeals of denials of Social Security benefits, the plaintiff must set forth explicit contentions regarding issues raised.  "Each contention **must be supported by specific reference to the portion of the record relied upon and by citations to statutes, regulations, and cases**

---

[6] The Social Security Regulations define light work as follows:
Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.
20 C.F.R. § 404.1567(b).

**supporting plaintiff's position.**"[7]  General Order 18 at p. 2 (emphasis added).  Plaintiff's blatantly abridged Brief has, in effect, placed an inappropriate burden on this Court to scour the record in search of what may be considered "support" for Plaintiff's claims of errors.  Despite this vexation, we have nevertheless reviewed the ALJ's decision and the medical record and find that the above RFC is well supported by substantial evidence.  Reference is made to the above medical history recitation.  *See supra* Part I.A.

The opinions of Mack's treating and examining physicians are in accord with the ALJ's RFC assessment.  Dr. Minhas, a neurologist with UHSH, who had treated Plaintiff for his seizure disorder, noted that Plaintiff's testing results were normal and opined that Plaintiff had no physical limitations, other than his inability to drive a car per New York State Law.  Tr. at 224-30.  Dr. Stillman, a physician of occupational medicine at UHSH, stated that Plaintiff should avoid strenuous exertional activity and refrain from using heavy machinery or climbing ladders.  *Id*. at 284.  Dr. Mohapatra, Plaintiff's treating cardiologist, opined that Plaintiff had no disabling limitations from a cardiac standpoint.  *Id*. at 279.  As the ALJ noted, State Agency Consultive Physician Dr. Seok, "ascertained good remaining ability for most basic work-related physical activities, with nonexertional need only to avoid exposure to the definite risk of bodily harm, temperature extremes, or driving."  *Id*. at 19 (citing Tr. at 251-57).  Even Dr. Park, Plaintiff's treating physician for seizure disorder, noted normal testing results and opined, at least earlier in the record, that Mack had no limitations in sitting, standing, or walking, and only some unspecified

---

[7] General Order 18 further notes that "[c]ases from other districts and circuits should be cited only in conjunction with relevant cases from this jurisdiction or if authority on point from this jurisdiction does not exist." General Order 18 at p. 2.  Thus, Plaintiff's citation to Sixth Circuit cases decided in 1970 and 1978 have no bearing on this Court's determination; in any event, the cases were cited for propositions that are seemingly misplaced.  Dkt. No. 7 at p. 8.

restrictions in lifting, carrying, pushing, and pulling.  *Id*. at 231-37.

In making the RFC assessment, the ALJ stated the weight afforded to the various medical

opinions contained in the record as follows:

> The opinions of the [State Agency] expert is granted the substantial evidentiary weight
> due to them pursuant to Social Security Ruling 96-6p. . . . The opinions of the treating
> source are granted, initially at least, the additional evidentiary weight due to them
> pursuant to 20 CFR Section 404.1527(d).  At the same time, these opinions must meet
> the further requirements of Social Security Ruling 96-2p, which specifies that **those**
> **opinions must be supported by clinical and laboratory test reporting from the**
> **source himself, and must in any case not be inconsistent with the other medical**
> **evidence in the file.**

Tr. at 17 & 18 (emphasis added).

The ALJ then explained that because Dr. Park's opinions were inherently defective and inconsistent

with other medical evidence, such opinions were accorded little weight.  *Id*. at 18-19.

Under the Regulations, a treating physician's opinion as to the nature and severity of a

claimant's impairment is entitled to "controlling weight" when it "is well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other

substantial evidence in [the] case record[.]"  20 C.F.R. § 404.1527(d)(2); *see also Rosa v. Callahan*,

168 F.3d 72, 78-79 (2d Cir. 1999).[8]  While the Treating Physician Rule dictates deference regarding

the nature and severity of a claimant's impairments, "[a] treating physician's statement that the

claimant is disabled cannot itself be determinative."  *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir.

1999); *see also* 20 C.F.R. § 404.1527(e)(1) (Commissioner provides the ultimate decision on

disability).  The treating physician doctrine recognizes that a claimant's treating sources, which in

---

[8] A "treating physician" is the claimant's "own physician, osteopath or psychologist (including outpatient clinic and health maintenance organization) who has provided the individual with medical treatment or evaluation, and who has or had an ongoing treatment and physician-patient relationship with the individual."  *Jones v. Apfel*, 66 F. Supp. 2d 518, 524-25 (S.D.N.Y. 1999) (quoting *Schisler v. Bowen*, 851 F.2d 43, 46 (2d Cir. 1988)); *see generally* 20 C.F.R. §§ 404.1513 & 404.1527.

most cases are medical professionals, are more apt to "provide a detailed, longitudinal picture of

[the patient's] medical impairment(s) and may bring a unique perspective to the medical findings"

as opposed to an evaluation of a one-time non-examining, non-treating physician.  20 C.F.R. §

404.1527(d)(2); *see Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993).

In analyzing a treating physician's opinion, "the ALJ cannot arbitrarily substitute his [or

her] own judgment for competent medical opinion."  *McBrayer v. Sec'y of Health and Human

Servs.*, 712 F.2d 795, 799 (2d Cir. 1983); *see also Balsamo v. Chater*, 142 F.3d 75, 80-81 (2d Cir.

1998).  Furthermore, when weighing all medical opinions and assessing what weight to accord,

"[t]he duration of a patient-physician relationship, the reasoning accompanying the opinion, the

opinion's consistency with other evidence, and the physician's specialization or lack thereof" are

considerations.  *Schisler v. Sullivan*, 3 F.3d at 568; 20 C.F.R. § 404.1527(d)(1)-(6); *see also Schaal

v. Apfel*, 134 F.3d 496 (2d Cir. 1998).  In the event the ALJ does not give controlling weight to the

treating physician, he must specifically state the reasons for doing so.  20 C.F.R. § 404.1527(d)(2).

As the ALJ correctly assessed, Dr. Park's assessment of total functional limitation is

inconsistent with other substantial evidence and is not supported by his own medical records.  In

this regard, ALJ Tarrant comprehensively explained that Dr. Park's statements regarding Mack's

functional assessment, which seem to propose almost total disability, were "widely at variance"

with other evidence.  Tr. at 18.  On May 23, 2000, three days after suffering his first seizure, Mack

reported that he "feels good."  *Id*. at 268.  On October 23, 2000, more than five months after his

first seizure, Plaintiff had no complaints and had not experienced any seizures.  *Id*. at 269.  Included

in Dr. Park's treatment notes is a notation that Mack is "on disability" though, as the ALJ surmised,

it is possible that such reference is to some work-related disability compensation Mack may have

been receiving. *Id.* Thus, on February 6, 2001, when Dr. Park noted "disabled since 5/19/01," it is possible that this too is a reference to some disability compensation Mack had been receiving. Such conclusion is logical in view of the fact that on that same date, Dr. Park's notes reflect "no seizures." Notably, even if Dr. Park were making a determination as to Mack's "disability status," the ALJ need not give such opinion any weight since such matters are reserved for the Commissioner. 20 C.F.R. § 404.1527(e) ("[The Administration is] responsible for making the determination or decision about whether you meet the statutory definition of disability. . . . A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled. . . . [The Administration] will not give any special significance to the source of an opinion on issues reserved to the Commissioner . . . .").

Furthermore, and this Court deems this to be most critical in the ALJ's weight assessment of Dr. Park's statements, Dr. Park's functional evaluations were not only inherently inconsistent, in that he continued to alter his functional assessments, but such evaluations were also inconsistent with the medical record. Most pressing is the fact that Dr. Park's assessment of significant lifting and carrying limitations cannot be supported by his treatment of Mack's seizure disorder, but rather, can only be connected to Mack's cardiac condition. However, Dr. Park did not treat Plaintiff for his cardiac condition and, yet, Mack's primary cardiologist, Dr. Mohapatra, reported that Plaintiff is **not disabled** from a cardiac standpoint. Dr. Mohapatra's assessment is clearly supported by the medical record as catheterization results were basically negative for critical coronary artery narrowing and did not suggest nor support total disability. Similarly, stress echo testing was basically negative. Since Dr. Park's functional assessments are not supported by the medical record, and in fact are contradicted by such, the ALJ was correct in affording such opinion little

*-16-*

weight.

Mack also contends that the ALJ failed to properly credit his allegations of pain. Under 20 C.F.R. § 404.1529(a), subjective pain will be considered in determining a claim for disability to the extent in which "symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." Symptoms such as pain are to be considered by the ALJ at all steps of the disability determination. 20 C.F.R. §§ 404.1529(a),(d). A claimant's statements about the persistence, intensity, and limiting effects of these symptoms are evaluated in the context of all objective medical evidence, which includes medical signs and laboratory findings. *Id*. at § 404.2539(c)(4). In a case where subjective symptoms are identified, "the ALJ has discretion to evaluate the credibility of the claimant and to arrive at an independent judgment, in light of the medical findings and other evidence, regarding the true extent of the pain alleged." *Brandon v. Bowen*, 666 F. Supp. 604, 608 (S.D.N.Y 1987). Where the ALJ resolves to reject subjective testimony with regards to pain and other symptoms, he or she "must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his [or her] determination is supported by substantial evidence." *Id*. at 608 (citing, *inter alia*, *Valente v. Sec'y of Health and Human Servs.*, 733 F.2d 1037, 1045 (2d Cir. 1985)). In evaluating a claimant's complaints of pain, an ALJ must consider several factors set forth in the Regulations including:

(I)    [The claimant's] daily activities;
(ii)   The location, duration, frequency, and intensity of [claimant's] pain or other symptoms;
(iii)  Precipitating and aggravating factors;
(iv)   The type, dosage, effectiveness, and side effects of any medication [claimant] take[s] or ha[s] taken to alleviate [his or her] pain or other symptoms;
(v)    Treatment, other than medication, [claimant] receive[s] or ha[s] received for relief of [his or her] pain or other symptoms;

(vi)    Any measures [claimant] use[s] or ha[s] used to relieve [his or her] pain or other symptoms (e.g., lying flat on [his or her] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii)    Other factors concerning [claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

In the case at bar, while there clearly exists medically determinable impairments, the objective medical evidence does not support Mack's claim of incapacitating symptoms.  In considering the above factors, the ALJ properly found Plaintiff's allegation of disabling symptoms as not fully credible.  First, the record reflects that Mack did not always comply with treatment.  Dr. Minhas reported that Mack ceased taking Dilantin as prescribed just four days after his first seizure. Tr. at 277.  His Dilantin levels were sub-therapeutic on September 18, 2000.  *Id*. at 240.  Dr. Ribner also noted that Plaintiff failed to increase his Dilantin dosage as was recommended.  *Id*. at 292.

Second, with regard to Plaintiff's coronary artery diseases, the medical record establishes that sometime in 2001 Plaintiff reported smoking cigarettes again after many years of abstinence. Apparently, prior to his heart attack in 1993, Plaintiff smoked a pack-a-day.  *Id*. at 238.  Mack reported to Dr. Agneshwar, on September 18, 2000, that he had not smoked in seven years, and other notations in the record indicate that Plaintiff was a non-smoker.  *Id*. at 209, 238, & 288. However, at the time of his admission to UHSH for chest pain on August 29, 2001, Mack reported smoking cigarettes.  *Id*. at 298.  A significant discussion was held with Plaintiff regarding his smoking and his health and the significant risks therein.  *Id*. at 299.

Third, Plaintiff's daily activities further undermine his allegations of total disability.  He testified and reported that he goes shopping with his wife three times a week.  *Id*. at 34-36 & 167. He also helps cook three times a week and does some light cleaning chores and dishes.  *Id*.  Mack states he reads a little, watches movies and baseball games on television, and tries to do things with

his daughter, like going to her swim meets at school.  *Id*.

Accordingly, the ALJ properly discounted Plaintiff's allegations regarding disabling pain. Further, as explained above, we find that the ALJ's assessment of Mack's RFC is supported by substantial evidence and, in making such assessment, the ALJ applied the correct legal principles.

### 2.  Vocational Expert Testimony

At Step Five of the sequential disability evaluation, the Commissioner bears the burden of proving that despite the claimant's severe impairments he or she is capable of performing work that is available in the national economy.  20 C.F.R. § 404.1520(g).  In determining whether jobs exist in the national economy, administrative notice of "reliable job information available from various governmental and other publications" may be taken, including The Dictionary of Occupational Titles, published by the Department of Labor.  *Id*. at § 404.1566(d).  If a claimant is unable to perform a full range of a particular exertional category of work, or an issue exists as to whether the claimant possesses transferable work skills, the ALJ may utilize the services of a VE.  *Id*. at § 404.1566(e).  "A vocational expert may provide testimony regarding the existence of jobs in the national economy and whether a particular claimant may be able to perform any of those jobs given his or her functional limitations."  *Charlebois v. Comm'r, Soc. Sec. Admin.*, 2003 WL 22161591, at *10 (N.D.N.Y. Sept. 12, 2003) (citing, *inter alia*, *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983)).  In order for the VE's opinion to be considered substantial evidence, the ALJ "must elicit the VE's testimony by asking hypothetical questions addressing the claimant's particular limitations and capabilities."  *Valoshin v. Sec'y of Health and Human Servs.*, 1986 WL 14624, at *5 (E.D.N.Y. Oct. 31, 1986) (citing *Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981)).  A VE's testimony should be given credit and due weight when "there is substantial record evidence to

support the assumption [underlying the hypothetical] upon which the vocational expert based his

opinion." *Renna v. Barnhart*, 2003 WL 21005281, at *3 (E.D.N.Y. May 2, 2003) (citing *Dumas v.*

*Schweiker,* 712 F.2d at 1554); *see also Aubeuf v. Schweiker*, 649 F.2d at 114 ("The vocational

expert's testimony is only useful if it addresses whether the particular claimant, with his limitations

and capabilities, can realistically perform a particular job.").

The ALJ surmised that Mack could not perform his past work as a heating and air

conditioning mechanic since typically such work entailed medium exertional demands.  However,

to clarify this issue and in light of the fact that significant non-exertional restrictions existed which

eroded the potential occupational base for other work, ALJ Tarrant sought testimony from VE

Esperanza DiStefano.[9]  Ms. DiStefano confirmed that Mack's past work as a heating and air

conditioning mechanic was a medium level job and a skilled position with SVP of 7.[10]  Tr. at 195

(citing The Dictionary of Occupational Titles (4th ed. 1991) ("DOT") at § 637.261-014).  Then, the

VE was provided the following hypothetical and asked to consider whether the skilled or semi-

skilled work activities performed in past work could be used to meet the requirements of other jobs

or kinds of work:

> Assume a person of fifty years of age with a high school education and work experience
> as a heating and air conditioning mechanic who is able to sit six hours in an eight-hour
> day, stand and walk six hours in an eight-hour day, lift, carry, push, and pull up to
> twenty pounds occasionally, and who must avoid situations of exposure to the definite

---

[9] Initially, Judge Tarrant sent Ms. DiStefano a series of Interrogatories, which were first reviewed, and not objected to, by Plaintiff's attorney. Tr. at 185-90.  After the VE supplied written answers, Plaintiff's counsel requested a supplemental hearing so he could further question the VE. *Id.* at 194-99.  Accordingly, a supplemental Hearing was conducted on March 7, 2002.

[10] "SVP" stands for "Specific Vocational Preparation" and refers to the "amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  The Dictionary of Occupational Titles (4th ed. 1991), App. C, Components of the Definition Trailer.  Such training can be acquired in a school, work, military, institutional, or vocational environment. An SVP of 7 indicates that vocational preparation would take over two years "up to and including" four years. *Id.*

risk of bodily injury, temperature extremes, driving, and confined spaces.
*Id*.

In response, the VE identified four jobs which the hypothetical claimant could perform using past

acquired transferable work skills, specifically, 1) hardware store clerk, DOT § 279.357-050, a

transferable position,[11] classified as light exertional level and semi-skilled, falls under the Retail

Salesperson category of which there are 3,964,680 positions in the national economy and 9,520

regionally; 2) counter clerk, DOT § 279.357-062, classified as light work, with 420,510 jobs in the

national economy; 3) hotel desk clerk, DOT § 238.367-038, classified as light work, with 175,150

jobs in the national economy; and 4) information clerk, DOT § 237.367-022, classified as sedentary

work but with sit/stand options, with 1,054,300 jobs in the national economy.  *Id*. at 195-96.  Upon

examination by Plaintiff's counsel, the VE clarified the nature of the alternative jobs identified as

types of work Mack could still perform.  Specifically, with regard to the hardware store clerk

position, the VE stated that such job is in the general sales area and demanded a knowledge of types

---

[11] The VE identified various skills Mack possessed in his past relevant work which are transferrable to the position of a hardware store clerk.  Such transferable skills include:

> installing, servicing and repairing environmental control systems utilizing knowledge of refrigeration, pipefitting and structural layout, using hand tools, following blueprints or engineering specifications. . . . fabricating, assembling and installing ductwork and chassis parts using metalworking tools, and welding equipment. . . . ability to precisely cut and bend tubing to correct length and shape, using cutting and bending equipment and tools. . . . ability to install air and water filters. . . . observation of gauges and ability to adjust controls to ensure efficient operation. . . . testing joints and connections for gas leaks, and replacing defective breaker controls, thermostats, switches, fuses, and electrical wiring to repair installed units, using electrician's handtools and test equipment.

Tr. at 195.

She further testified that a salesperson of general hardware would need the following skills:

> The individual would have to have knowledge of the various tools and whatever is used to repair, nuts, bolts, screws.  They would have to have knowledge of hand and power tools, electrical equipment, plumbing supplies, and advise – be able to . . . communicate and advise the customer on what they may need in order to repair whatever they're looking to purchase so that they can go home and do their repairs, and inform the consumer about the quality, so they would have to have the knowledge of the quality of the various tools that they are – they're in charge of in the store or location where they're working. . . . They might [also] need to estimate what would be needed in order to do the job.

*Id*. at 62.

and quality of tools, and the ability to communicate with and advise customers. *Id*. at 58-60.

Further, the cited number of available jobs, 3,964,680 nationally and 9,520 regionally, represented

the more general category of "retail sales" and the precise number of hardware sales positions

within this broader category could not be determined. *Id*. at 64-66 & 195. However, in her expert

opinion, based on many years of experience, she estimated that approximately 10% of such

positions would fall directly into the hardware field. *Id*. at 66.

The ALJ determined that the VE's testimony was consistent with the information in the

DOT. Based on the testimony of the VE, and using the Medical-Vocational Guidelines as a

framework, the ALJ considered Mack's age, educational background, work experience, and RFC,

and determined that Mack is "capable of making a successful adjustment to work that exists in

significant numbers in the national economy." *Id*. at 23. Mack contends that the Commissioner

failed to meet her burden at Step Five since, first, the ALJ provided an improper hypothetical to the

VE, that is the RFC stated in the hypothetical was incorrect, and second, even considering the

hypothetical posed by the ALJ, the number of jobs identified by the VE is unreliable and

inconclusive. As to Mack's first contention, we have already explained that the ALJ's RFC

assessment is supported by substantial evidence and, thus, no error occurred when reciting the same

RFC in the hypothetical to the VE; we therefore need not address this first claim. We further find

Mack's second contention to be without merit, as fully explained below.

According to the Regulations, "[w]ork exists in the national economy when there is a

significant number of jobs (in one or more occupations) having requirements which [a claimant is]

able to meet with [the claimant's] physical or mental ability and vocational qualifications." 20

C.F.R. § 404.1566(b). The Regulations also provide that,

work exists in the national economy when it exists in significant numbers either in the region where [the claimant] live[s] or in several other regions of the country. It does not matter whether –

    (1) Work exists in the immediate area in which [the claimant] live[s];

    (2) A specific job vacancy exists for [the claimant]; or

    (3) [The claimant] would be hired if [he or she] applied for work.

*Id*. at § 404.1566(a).

Courts have generally held that what constitutes a "significant" number is fairly minimal. *See Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993) (citing various cases such as *Trimiar v. Sullivan*, 966 F.2d 1326, 1330-32 (10th Cir. 1992) (850-1,000 potential jobs is a significant number of jobs), *Nix v. Sullivan*, 744 F. Supp. 855, 863 (N.D. Ind), *aff'd*, 936 F.2d 575 (7th Cir. 1991) (675 jobs is a significant number), *Barker v. Sec'y of Health and Human Servs.*, 882 F.2d 1474, 1479 (9th Cir. 1989) (1,266 jobs is a significant number), *Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir. 1988) (500 jobs is a significant number), *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988) (1,350 jobs is a significant number), and *Allen v. Bowen*, 816 F.2d 600, 602 (11th Cir. 1987) (174 jobs is a significant number)); *see also Johnson v. Chater*, 108 F.3d 178 (8th Cir. 1997) (200 jobs in entire State of Iowa and 10,000 nationally is a significant number); *Wright v. Chater*, 969 F. Supp. 143, 147-48 (W.D.N.Y. 1997) (1700 jobs in the Finger Lakes region is a significant number). Similarly, we find that the number of jobs identified by the VE, even if one category is diminished by a small percentage in her estimation, constitutes a significant number of jobs, which the ALJ properly relied upon in finding that work existed in the national and regional economy that Plaintiff could perform and thus was not disabled.

### III.  CONCLUSION

    In light of the foregoing discussion, it is clear that in finding Mack was not disabled, the ALJ applied the correct legal standards and his factual findings are supported by substantial

evidence.  Thus, this Court recommends that decision be upheld.

   **WHEREFORE**, it is hereby

   **RECOMMENDED**, that the Commissioner's decision denying disability benefits be

**AFFIRMED**; and it is further

   **ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and

Order upon parties to this action.

   Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written

objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE**

**APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y*

*of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R.

CIV. P. 72, 6(a), & 6(e).


IT IS SO ORDERED

Dated:        June 22, 2006
              Albany, New York

                                        _____
                                        RANDOLPH F. TREECE
                                        United States Magistrate Judge

*-24-*